(49 South. 590.)

No. 17,278.

DUSON et al. v. ROOS et al.

(March 24, 1909.)

1. VENDOR AND PURCHASER (§ 239*) — BONA FIDE PURCHASER—NOTICE.

A purchaser of real estate in good faith from the owner of record is not affected by equities which may have existed between former owners of the property and third persons, but which do not appear of record.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. § 584; Dec. Dig. § 239.*]

2. TENANCY IN COMMON (§ 20*)—REDEMPTION FROM TAX SALE—RIGHTS OF TENANTS.

A tenant in common may redeem the share of his co-tenant from a tax sale, but he is under no obligation to do so.

[Ed. Note.—For other cases, see Tenancy in Common, Cent. Dig. §§ 60, 61; Dec. Dig. § 20.*]

3. TAXATION (§ 725*)—TAX SALES — REDEMPTION.

A purchaser at a tax sale conveyed the land to a tenant in common after the expiration of the period of redemption. The price required to redeem was a little over $26, while the amount paid for the conveyance was $250. *Held* not to show that the sale by the tax sale purchaser was a mere redemption by the tenant in common.

[Ed. Note.—For other cases, see Taxation, Dec. Dig. § 725.*]

4. TAXATION (§ 743*) — TAX SALES — RENUNCIATIONS.

A tenant in common executed a power of attorney to an agent to accept from a purchaser at a tax sale a renunciation in favor of the estate to an undivided half thereof. The agent took on himself the purchase of the entire property from the purchaser, and the tenant in common ratified the act, and he understood that his transaction with the purchaser was a sale by the purchaser of the entire property. *Held,* that the transaction did not amount to a mere renunciation.

[Ed. Note.—For other cases, see Taxation, Dec. Dig. § 743.*]

5. TENANCY IN COMMON (§ 20*)—RIGHTS OF CO-TENANTS—ACQUISITION OF TITLE.

The doctrine that a tenant in common purchasing the property in common at a sale for taxes assessed against all the owners acquires only his own title, and not the title of the co-tenant, applies to a purchase by a tenant in common from the purchaser at tax sale, though the tenant in common was not in possession of the property at any time during which the tax should have been paid, and did not at any time occupy any special relation towards it, or towards the co-tenant, such as could give rise to a trust, and did not for any reason owe any greater duty to pay the tax than the co-tenant did.

[Ed. Note.—For other cases, see Tenancy in Common, Cent. Dig. §§ 60, 61; Dec. Dig. § 20.*]

6. TAXATION (§ 695*)—TAX SALES—REDEMPTION.

Owners need not redeem land sold at a tax sale nor reacquire it.

[Ed. Note.—For other cases, see Taxation, Dec. Dig. § 695.*]

7. TENANCY IN COMMON (§ 20*)—RIGHTS OF CO-TENANT.

Where a tenant in common purchased the premises from the purchaser at a tax sale, the co-tenant might require the tenant in common to make him a title in the proportion of their former ownership, but this right was not founded on any codal provision, but on mere equitable considerations, and must be exercised within a reasonable time, so that the co-tenant cannot sleep on his right and await developments to see whether the property will grow in value or not, and then exercise the right according to the event.

[Ed. Note.—For other cases, see Tenancy in Common, Dec. Dig. § 20.*]

8. APPEAL AND ERROR (§ 1177*)—REVERSAL—NECESSITY OF NEW TRIAL—RIGHTS OF CO-TENANTS.

A tax sale took place in 1888. A tenant in common purchased the premises from the purchaser in 1891. A co-tenant filed a suit in 1903 for partition of the land. There was nothing to show that during the interval the co-tenant made any effort to reimburse the tenant in common for the amount paid to the purchaser or otherwise sought to exercise his right to have the co-ownership established. *Held*, that the court before granting relief must decide whether the co-tenant had lost his right by laches, and that the case must be sent back that this point may be determined.

[Ed. Note.—For other cases, see Appeal and Error, Dec. Dig. § 1177.*]

Appeal from Eighteenth Judicial District Court, Parish of Acadia; Thomas Rutland Smith, Judge ad hoc.

Action by C. C. Duson and others against Isaac Roos and others. From a judgment for plaintiffs, defendants appeal. Reversed and remanded for new trial.

Edward Benjamin Du Buisson, for appellants Roos and intervener Opelousas Mercantile Co., Limited. Hampden Story, for appellee Duson. Gilbert Louis Dupré, for appellees the heirs of Victor Danel.

PROVOSTY, J. This is a partition suit. The dispute is as to the extent of the interest of some of the litigants, and as to whether some of them have any interest at all.

The property consists of 305 acres of land, described as "lots 2, 3 and 4 of section 17, T. 9, S. R. 2, W., parish of Acadia." Of this land no one has hereto had corporeal possession.

It was originally owned jointly by Victor Danel and Francois Feray. In 1875 the latter sold his half interest to estate of Jules Lepene and Auguste Ferre jointly.

In July, 1888, the property was sold at tax sale, lot 4 to one Helms for $7.97, as belonging to estate of Victor Danel, and lots 2 and 3 to one Lambert for $15.20, as belonging to estate of Francois Feray.

Some three years thereafter, in November, 1891, the executor of the estate of Jules Lepene gave a power of attorney to an agent to accept from Helms & Lambert a renunciation in favor of the estate to one undivided half of said lots 2, 3, and 4. The power of attorney refers to this undivided half as having been formerly owned by Lepene; and it refers to lots 2, 3, and 4 as having been acquired by Helms & Lambert at tax sale. By a separate act executed at the same time Auguste Ferre gave a like power of attorney to the same agent. It will be noted that it was not a mandate to buy, but to accept a renunciation, and that the renunciation was to be, not to one-fourth formerly owned by Lepene, but to one-half formerly owned by Lepene, and not to one-fourth formerly owned by Ferre, but to one-half formerly owned by Ferre. So that the recital in the two powers of attorney together amounted to a statement that Lepene & Ferre had formerly owned the entire property, and that the renunciation in their favor was to be the entire property. The powers of attorney are referred to in the acts, and are said to be annexed thereto, and were, in fact, so annexed, and were recorded with the acts.

In January, 1893, the estate of Lepene sold the undivided half of lots 2, 3, and 4 to W. W. Duson. Five months later Duson sold (not the undivided half, but) the entire property to J. Meyers & Co.

This firm having gone into liquidation, the property was sold at judicial sale to the Opelousas Mercantile Company, Limited. Not, however, at one sale, as a whole, but the undivided half at one sale in January, 1897, and other undivided half at another sale in June of the same year. At the second of these sales W. W. Duson read a notice warning all bidders that J. Meyers & Co. owned only an undivided fourth of lot 4 and an undivided half of lots 2 and 3, and that he was warrantor only to that extent.

The Opelousas Mercantile Company sold an undivided fourth interest in lots 2 and 3 and an undivided half interest in lot 4 to Isaac Roos.

In September, 1898, Auguste Ferre sold to George H. O'Mealey, with warranty, all his right, title, and interest to lots 2, 3, and 4. The act of sale recites that the said right, title, and interest was acquired partly from Helms and partly from Lambert, and gives the number and page of the registry of the acts by which said acquisitions were made. O'Mealey sold what he had thus acquired to C. C. Duson.

The present partition suit is brought by C. C. Duson, who claims title to one-fourth undivided, and by four of the children and heirs of Victor Danel, who for themselves and their co-heirs claim title to one-half undivided. The said co-heirs and Isaac Roos are made defendants. The interest of Roos is alleged to be one-fourth. The Opelousas Mercantlie Company intervened, claiming title, under its purchase from W. W. Duson, to the entire property, excepting only the interest which it had sold to Roos.

It will be remembered that W. W. Duson sold to the Opelousas Mercantile Company the entire property, although he had acquired from the estate of Lepene only an undivided half of it. The Opelousas Mercantile Company alleged in its intervention that C. C. Duson in his purchase from O'Mealey had merely been a person interposed for W. W. Duson, and that W. W. Duson had in consequence been the owner of the entire property at the time of his sale to it. It relied also on the prescription of 10 years. But it has now abandoned both of those grounds, and recognizes that in the O'Mealey sale C. C. Duson was not a person interposed for its vendor, W. W. Duson.

The half interest acquired by C. C. Duson from O'Mealey and by O'Mealey from Auguste Ferre was made up of one-fourth acquired by Ferre from Francois Feray and one-fourth acquired by Auguste Ferre from Lambert and Helms, which Lambert and Helms had acquired at the tax sales, as formerly belonging to Victor Danel. C. C. Duson by limiting his claim to one-fourth—i. e., to the fourth acquired by Auguste Ferre from Francois Feray—concedes the claim of the heirs of Victor Danel to a fourth interest.

Therefore no contest arises in connection with the half interest owned by Francois Feray which he sold to Lepene and Ferre. Lepene's part of this half or one-fourth of the whole was sold at Lepene's succession sale to W. W. Duson, who sold it to J. Meyers & Co., who sold it to the Opelousas Mercantile Company, who sold it to Roos, and Ferre's part of said undivided half, or one-fourth of the whole, was sold by Ferre himself to O'Mealey, who, in turn, sold to plaintiff C. C. Duson. And no contest arises in connection with one-half of the one-half originally owned by Victor Danel, which was sold at tax sale to Helms & Lambert and by Helms & Lambert to Auguste Ferre, and by the latter to O'Mealey and by O'Mealey to C. C. Duson, and to which C. C. Duson has now renounced. This one-fourth remains then to the heirs of Danel. The sole contest is over the other half of the one-half interest originally owned by Victor Danel. The Opelousas Mercantile Company and Roos contend that this one-fourth interest passed to Helms & Lam-

bert by the tax sale and to estate of Lepene by transfer from Helms & Lambert, and to W. W. Duson at succession sale of estate of Lepene, and from W. W. Duson to them. The Opelousas Mercantile Company not having ever had more than a one-half interest in the property, and having sold a one-half interest in lot 4 to Roos, it has no longer any interest in lot 4. It sold a fourth interest in lot 2 and 3 to Roos. The most it can now claim, therefore, is a one-fourth interest in lots 2 and 3.

The contention of the heirs of Danel is that the tax sales to Helms and Lambert were null and void, and were recognized so to be by the latter, who did not in reality sell the property to estate of Lepene and Ferre, but merely allowed it to be redeemed; that these redemptions were given the form of a sale only by an error of the notary, and that their sole effect was to do away with the tax sales and restore the situation to what it had been before the tax sale—that is to say, restore the property to its former owners in the same proportions in which they had held it.

Parol evidence was permitted to be offered by the heirs of Danel, over the objection of Roos and of the Opelousas Mercantile Company, to prove that the said sales by Helms and Lambert to Lepene and Ferre were not in reality sales, but mere redemptions. The evidence should have been excluded, and must now be disregarded. It is plain that a purchaser of real estate in good faith from the owner of record cannot be affected by equities which may have existed between former owners of the property and third persons, but which do not appear of record. Harris v. Natalbany Lumber Company, 119 La. 978, 44 South. 806.

The heirs of Danel contend, however, that the true nature of these so-called sales from Helms and Lambert to estate of Lepene and Ferre appears by the record itself; that it appears from the power of attorney annexed to and recorded with the acts which are mandates to accept not a sale, but a renunciation. The nature of the transactions is also said to be shown by the insignificance of the price of said so-called sales compared with the value of the property at the time.

Whatever these transactions may have been, they were certainly not redemptions. At the time they were made the delay for redemption had expired for over two years. No reason is suggested why estate of Lepene & Ferre, if desirous to redeem or to contest the tax sales, should have waited more than three years to do so; nor why they should have redeemed Danel's half in which they had no interest. A co-owner in indivision has the right to redeem the share of his co-owner, but is under no obligation, moral or other, to do so. For estate of Lepene & Ferre to have put out their money for redeeming Danel's half might have been a kind and neighborly act, but not business. Nor is this all, but the disparity between the price which they paid and the amount which would have been required for redemption would go to show that the transactions were not redemptions. The price which they paid was $100 in the one case and $150 in the other, whereas the amount required to redeem from Lambert would have been $15.20 and from Helms $7.97, plus 20 per cent. of these amounts, or say, $18.24 in the one case and $8.13 in the other.

Nor were these transactions mere renunciations. Had they been such, they would have been confined to the undivided half of which Lepene & Ferre had been owners, and would not have embraced the other undivided half, of which Lepene & Ferre had never been owners. Lepene & Ferre would have had no interest in a renunciation to Danel's half. It will be noted that the powers of attorney confer no authority to make any payment, but merely to accept a renunciation.

The inference would be that for some reason not explained the agent took upon himself to purchase the entire property from Helms & Lambert, and that his principals ratified his act.

That they did ratify the act there can be no question. The estate of Lepene sold to W. W. Duson, not a fourth, but a half; and Ferre sold to O'Mealey, not a fourth, but a half. The act of sale from Ferre to O'Mealey recites that the property sold was acquired by purchase from Helms & Lambert. Auguste Ferre and the executors of the estate of Lepene would certainly seem to have understood that their transactions with Lambert & Helms had been a sale of the entire property.

So far as concerns the disparity between the real value of the property and the price which Ferre and estate of Lepene paid for it to Helms & Lambert, nothing shows that O'Mealey or the Opelousas Mercantile Company or Roos, who bought on the faith of the record, had any knowledge of what had been the value of the property at that time.

The learned counsel for the heirs of Danel contends, however, that it really makes no difference whether the said so-called sales were renunciations of the title acquired at the tax sales or genuine sales, because Ferre and the estate of Lepene, as former co-owners of the property with Victor Danel, were incapable of acquiring a title to it without such title inuring to their said former co-owner Danel in the proportion of his former interest in the property.

The doctrine here invoked is the same which has heretofore been enforced by this court in cases where the co-owner had bought directly at the tax sale. Hake v. Lee, 106 La. 482, 31 South. 54; Levy v. Levy, 107 La. 589, 32 South. 117; Bossier v. Herwig, 112 La. 545, 36 South. 557. And the majority of the court are of the opinion that this doctrine is equally applicable to a case like the present, where the purchase was not directly at the tax sale, but from the purchaser at the tax sale. The writer of this opinion defers to the judgment of his colleagues in the matter, but questions very much whether this doctrine should be enforced under the peculiar circumstances of this case where the purchasing co-owners were not in possession of the property during any part of the time during which the tax should have been paid, and did not at any time occupy any special relation towards it or towards their co-owners such as could give rise to a trust, and did not for any reason owe any greater duty to pay the tax than their co-owners did, where, in other words, the sole and exclusive relation between them and their former co-owners or between them and the common property was the bare and naked fact of the co-ownership.

After property has been sold at tax sale, however, the former owners of it cannot be compelled to redeem or reacquire it. Hence it is optional with them to take advantage or not of this doctrine by which a title acquired by any one of the co-owners from the purchaser at the tax sale inures to the benefit of the other co-owners. These other co-owners have a right to require their co-owner to make them title in the proportion of their former co-ownership; but this right is not founded upon any codal provision, but on mere equitable considerations, and, such being the case, must be exercised within a reasonable time or it will be lost. These other co-owners cannot sleep upon this right, await developments, to see whether the property will grow in value or not, and then exercise the rights or not, according to the event. He who seeks equity must do equity. In the recent case of Joffrion v. Gumble (La.) 48 South. 1007, ante, p. 391, this court refused to enforce a promise of sale which had thus been slept on too long.

In the case at bar the tax sale took place

in 1888. The purchase from the purchaser at the tax sale was in 1891. This suit was not filed until September, 1903. Whether in this long interval of 15 years Danel or his heirs made any effort to reimburse their half of the amount which Ferre and estate of Lepene paid to Helms & Lambert or otherwise sought to exercise their right to have the co-ownership re-established the record does not show. The case, however, was not tried on those lines, and justice requires that the parties should have an opportunity of so trying it.

The judgment appealed from is accordingly set aside, and the case is remanded for trial, with a view to ascertaining how far Danel or his heirs have by their laches or delay lost their right to compel estate of Jules Lepene and Auguste Ferre, or their assigns, to make them title to the property in dispute in the proportion of their co-ownership of same before the tax sale of 1888. The costs of this appeal to be paid by heirs of Danel, all other costs to await final results.