(57 South. 581.)

No. 18,689.

GULF REFINING CO. OF LOUISIANA v. HART et al.

(Jan. 15, 1912. Rehearing Denied Feb. 12, 1912.)

*(Syllabus by the Court.)*

1. EVIDENCE (§ 208*)—JUDICIAL ADMISSIONS —PLEADING DISMISSED.

One who brings suit, praying to be recognized as heir at law of another, and in that capacity alone put in possession of the estate of such other person, making the inventory thereof part of his petition, as designating or describing the property of which the estate consists, and whose suit is dismissed, whether as in case of nonsuit or otherwise, is bound by his judicial admissions as to the title of the property so claimed; and neither he nor a person claiming under him can be heard, years afterwards, to allege that he owned such property, at the time the suit was brought, by a title other than that set up.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 713–725; Dec. Dig. § 208.*]

2. TENANCY IN COMMON (§ 20*) — MUTUAL RIGHTS OF CO-OWNERS — ACQUISITION OF ADVERSE TITLE.

One who invokes the rule that a co-owner, who acquires common property sold for taxes, does so for the benefit of his co-owners, as well as himself, must come with clean hands and present a case calling for the interposition of a court of equity, since the rule so invoked finds its support in equity alone.

[Ed. Note.—For other cases, see Tenancy in Common, Cent. Dig. §§ 60, 61; Dec. Dig. § 20.*]

Appeal from First Judicial District Court, Parish of Caddo; Thomas F. Bell, Judge.

Action by the Gulf Refining Company of Louisiana against Tycus Hart, Jr., and others. From a judgment for plaintiff, defendants appeal. Judgment amended so as to reject demands of plaintiff in toto.

John B. Files, for appellant Tycus Hart, Jr. Wise, Randolph & Rendall, for appellant J. C. Trees Oil Co. Blanchard & Barret & Smith and D. Edward Greer, for appellee.

Statement of the Case.

MONROE, J. This is a petitory action for the recovery of an undivided nineteen-twentieths interest in a tract of land described as W. ½ of W. ½ of south 21, township 21, range 16 W., parish of Caddo, and in which plaintiff prays that Tycus Hart, Jr., and the "J. C. Trees Oil Company" be cited, and that it have judgment decreeing it to be the owner of said tract and put in possession thereof, and that certain oil and mineral leases from Hart to his codefendant be annulled, in so far as they may affect its interest. Defendant Hart sets up title to and possession of the whole tract, and pleads estoppel, res judicata, and the prescription of three, five, and ten years. The oil company alleges that it has rights under a recorded lease, and further defends on the grounds set up by its lessor. The main facts of the case, as disclosed by the evidence, are as follows:

The land in dispute was entered in 1872 as a homestead by Mrs. Letitia Nunn, a widow, and at her death in 1877 devolved upon her five children, to wit, Samuel, Thomas, John, Richard, and Cynthia (Mrs. Butterfield). Thomas had remained on the place

with his mother; but the others had moved a few miles away, across the state line, into Texas, or did so after their mother's death. In December, 1885, Samuel sold his interest in the land to Richard, and on May 4, 1886, Richard sold his interest, as also the interest which he had thus acquired from Samuel, to Thomas. And by the same act Mrs. Butterfield appears to have sold her interest to Thomas; but she denies that she signed the act, and we shall consider the facts in that connection, as, also, those connected with the disposition of John's interest, a little later. On May 7, 1886, the property was sold for unpaid taxes, assessed in the name of Letitia Nunn, to Leon M. Carter, who, on April 12, 1889, sold it to A. H. Leonard, who, on May 24, 1890, sold it to Thomas Nunn. On May 11, 1900, Thomas Nunn died, leaving no forced heirs, and leaving a will, whereby he bequeathed his entire estate to Tycus Hart, Jr., and Elizabeth Watson, in the proportions of four-fifths to Hart and one-fifth to Watson, and the will was shortly afterwards presented to the district court for probate and ordered to be executed, and other steps, preliminary to putting the universal legatees in possession, were taken, as will appear. On September 17th following, Samuel and John Nunn and Mrs. Butterfield brought suit, alleging that the testator had left "but a small estate, consisting of real estate and personal property"; that the will had, ex parte, been ordered executed; that Hart had been confirmed and had "qualified as executor of said estate, and that an inventory had been made according to law;" that, for reasons which are set forth, the will was null, and praying that it be so decreed; and that they be recognized as the heirs at law and "put in possession of the estate of the said Thomas Nunn according to law." The case was put at issue by the answer of Hart and Watson, and was fixed on October 31, 1900, upon and after which date the following entries appear upon the clerk's docket, to wit:

"Oct. 31, 1900. Dis. at plff.'s cost.
"Nov. 3, 1900. Motion to tax costs filed and fixed for Monday."

On the same day (October 31, 1900), there was judgment recognizing Hart and Watson as the universal legatees of the decedent, and ordering that they "be placed in possession of all the property, real and personal, belonging to the succession, * * * as shown by inventory on file," and that Hart be discharged as executor. The only real property appearing on the inventory thus referred to is that shown as follows, to wit:

160 acres of land @ $11.50 . . . . . . . . . . $240 00
   *    *    *    *    *    *    *

Recapitulation.

Real estate . . . . . . . . . . . . . . . . . . . . . . . 240 00
Personal property . . . . . . . . . . . . . . . . . 327 78

Total . . . . . . . . . . . . . . . . . . . . . . . . . $567 78

On December 26, 1900, by notarial act recorded January 10, 1901, Hart acquired, by purchase, the one-fifth interest in said real estate of his colegatee, Elizabeth Watson. On December 6, 1907, he made an oil and mineral lease of the whole of said property, for a term of 10 years, to Benedum, Glenn & Thomas, who, on January 15, 1908, assigned their interest in the lease to "J. C. Trees Oil Company," defendant herein, by an instrument which was placed of record January 20, 1908; and in September, 1910, Hart entered into a contract with said company, amendatory of said lease, which contract was recorded September 23, 1910.

In the meanwhile, Samuel Nunn having died in 1905, leaving, as his heirs, his four children, Oscar, Jackson, Fred, and Cassie, and Richard having died in (or about) 1887, unmarried and intestate, a Mr. Matthews, acting in behalf of William Hamilton, called on the surviving members of the family —that is to say, Mrs. Butterfield, John, and

the heirs of Samuel—and obtained from them, at different dates in February, 1910, deeds purporting to convey their interests in the land in dispute, as inherited from Letitia, Samuel, Thomas, and Richard Nunn, and thereafter, on March 26, 1910, Hamilton instituted suit against Hart, alleging that he had, in the manner stated, acquired a three-fourths interest in said land, and praying that his title be recognized, to which suit Hart answered; whereupon testimony was taken, and the case was fixed for trial. Upon the day upon which it was fixed, however, it was discontinued, on plaintiff's motion, as in case of nonsuit. Hart then brought suit against Hamilton for slander of title, and, Hamilton having conveyed his interest in the land to plaintiff, the latter at once instituted this petitory action.

By an act apparently acknowledged before S. J. White, a notary public of Marion county, Tex. (which adjoins Caddo parish, La., and has been the home of plaintiff's authors for many years), Richard Nunn and Mrs. Butterfield appear to have sold their interest in the land in dispute, including the interest of Samuel, which had been acquired by Richard, to their brother Thomas. The deed is dated May 4, 1886, and is supplemented by what purports to be a receipt, signed by Mrs. Butterfield, reading as follows:

"10.00.                           June 1, 1886.
"Received of Thomas Nunn ten dollars part pay on land sold to Thomas Nunn by me.
                              "C. A. Butterfield."

This is further supplemented by the testimony of J. J. Gray, a witness called by defendants, who says that he has been a neighbor of the Nunns, and has known them nearly all his life; that shortly after the death of Thomas Nunn, Samuel and Mrs. Butterfield came to his house separately, and, complaining that their brother Thomas had left his property to strangers, said that the will ought to be broken, and asked whether he would be willing to testify that Thomas was crazy.

"Mrs. Butterfield [says the witness] came there and says: 'You know brother Tom was crazy. Do you know whether he was crazy or not?' and I says: 'What! I did not know it.' And she said: 'It looks like it was hard that he would will his stuff off to an individual, to disinterested party.' The sum and substance of what she said was, a stranger. Q. But what did she say about selling her interest? A. I says: 'Didn't you all sell your interest to Tom?' and she says: 'Yes; we sold to Tom, but we ought to get it at his death. He had no issue; but he ought not to give the stuff to a stranger.' That is what she told me."

The witness also testified that Samuel and John Nunn had likewise told him that they had "all" sold their interests to Tom.

Mrs. Butterfield denies that she signed either the deed or the receipt, or that she told Gray that she had sold her interest to Tom. Her testimony concerning the two documents, as exhibited to her, and concerning other matters of interest, reads, in part, as follows:

"Q. Mrs. Butterfield, is that your signature to that deed? A. No, sir; it is not. Q. Do you know the writing of your brother, R. A. Nunn? A. I think I would mighty near know it, anyhow. Q. Did you often see him write his name? A. Yes; often. He lived with me for years. Q. How many years did he live with you? A. Well, he lived with me several times, four or five months at a time, for five or six years. Q. He lived at your home? A. Yes, sir. Q. He was your younger brother? A. Yes, sir. Q. Youngest in the family? A. Yes, sir; and I nearly raised him. Q. How old was he when he died? A. I do not know whether I know exactly, but he was about 23 or 24 years old, I reckon. I cannot say exactly. Q. Mrs. Butterfield, in the deed which I have heretofore exhibited to you appears the signature of R. A. Nunn. I will ask you if you recognize that to be his signature to it? [Showing witness document referred to.] A. It looks mighty familiar like, just like it; and I feel certain that is his signature. That is all I can say. I didn't see him write it. I feel sure that is his writing. Q. Who signed your name to that deed? A. Well, I found out afterwards— (Objected to as hearsay; objection sustained by the court; exception.) Q. In whose handwriting, if you know, state is 'C. A. Butterfield' signed to this deed? You have testified that 'C. A. Butterfield' was not signed by you; in whose handwriting is that 'C. A. Butterfield' signed to that deed? A. The

same one wrote both. * * * Q. Mrs. Butterfield, did you afterwards learn that R. A. Nunn had signed your name to that deed? (Objection; ruling and exception.) * * * Q. I will ask you if you can state in whose handwriting that signature is? [Exhibiting the receipt to the witness.] A. No; I do not recognize this one; this is not like that on the other one—on the deed."

On cross-examination, she said:

"He [her brother, R. A. Nunn] lived in the house with me; my house was considered his home. He did not stay there all the time. Q. Made that house his home as much as any place? A. Yes, sir. Q. You were all close together? A. Yes, sir; I reckon we were when living in the same house. Q. You had an affection for him? A. Yes, sir; I have yet. Q. You had confidence in him? A. Yes, sir. * * * Q. Did you know Mr. White, the justice of the peace that used to be there? [Referring to the notary before whom the act of sale in question appears to have been acknowledged.] A. Yes, sir. Q. Where is he? A. Dead. * * * Q. You knew him well? A. Yes, sir. Q. He was considered a good man? A. Yes, sir. * * * No; I do not know anything about the land that Letitia Nunn owned being sold for taxes; but it was the understanding that Thomas Nunn was to keep up the taxes for the use of the place. Thomas Nunn was acting for all the heirs. (Admitted subject to objection.)"

The witness further testifies that she sold her interest in the land to Hamilton for $80, because she was needy, and was not able to prosecute a lawsuit.

There were called to the stand two witnesses who testified as experts in handwriting. One of them was of opinion that the signatures to the receipt and deed and the admitted signature of Mrs. Butterfield (affixed to her depositions in the case of Hamilton v. Hart) were written by the same hand. The other witness had had submitted to him, out of court, the signature to the deed (executed in 1886) and the signature to the depositions (executed some 24 years later), and had expressed the opinion that they were not written by the same hand. When, upon the trial, he was shown the signature to the receipt, and compared it with the others, he said that he thought that it and the signature to the depositions had

been written by the same hand. Whether he still adhered to the view, as previously expressed, with regard to the signature to the deed, is not made clear.

Defendants have produced no deed from John to Thomas Nunn, and certain testimony, probably bearing upon the existence of such a deed, was excluded as follows: The defendant Hart had testified that Thomas Nunn, at a time when he was very sick, and not long before his death, had handed him the deeds from Samuel to Richard and from Richard and (apparently) Mrs. Butterfield to him (Thomas), and that he (the witness) had deposited them in the safe of a gentleman at Vivian. He was then asked, and he answered, as follows:

"Q. They were handed to you by Mr. Tom Nunn? A. Yes, sir; he told me he had another deed. (Objected to and excluded as hearsay.)"

Defendants, however, produced a receipt, the signature of John Nunn to which is admitted, and which reads as follows:

"$19.77.                              Caddo Parish, La.,
                              "October the 9th, 1886.
"Received of T. P. Nunn the sum of nineteen dollars and seventy-seven cents in full of all demands up to date.    [Signed]  J. E. Nunn."

John Nunn was examined, under commission, for the purposes of the case of Hamilton v. Hart (to which we have referred), and his testimony so given was offered in this case. Included in the examination in chief, we find the following interrogatory and answer (they having been admitted, subject to defendants' objection that parol evidence was inadmissible), to wit:

"Q. Do you know anything about the land Letitia A. Nunn owned in Caddo parish having been sold, after her death, for taxes, and having been bought in at tax sale by Leon M. Carter; if so, state all you know about the matter. Carter transferred the tax title to A. H. Leonard, and the latter transferred it to Thomas Nunn. What do you know about that transaction? State all the facts. Was Thomas Nunn acting for himself solely, or for all the heirs, in thus taking back the title from Carter

and Leonard? Tell all you know about this fully. Was not Thomas Nunn redeeming the land for all the heirs; was not this the understanding between Thomas Nunn and the other heirs? A. I know nothing about this question, further than that the only agreement I had with Thomas Nunn was that he was to keep up the property for the use of the place. This agreement was had at the time that he paid me the $19.77 in balance of settlement, same being due me for rent on the place."

## Opinion.

Plaintiff has abandoned its claim as to the interests in the land described in the petition which were inherited from Letitia Nunn by her sons, Samuel and Richard, and, having obtained judgment recognizing it as the owner of the two-fifths interest so inherited by Mrs. Butterfield and John E. Nunn, is asking only for the affirmance of that judgment. Mrs. Butterfield, as we have seen, intimated in her testimony that she "found out afterwards" that her brother Richard had signed her name to the deed, whereby her said interest appears to have been conveyed to her brother Thomas; and in the course of the trial plaintiff offered John Nunn to testify that Richard had told him so, from which, though the testimony was excluded, we infer that, if it be true that Richard did sign his sister's name, she knew it before he died, which was about 24 years ago, and the question which suggests itself is: If she was unwilling to make the charge of forgery against him while he was alive, and while Nunn, whom she knew to have paid his money for, and to be relying on, a forged deed, was alive, why should she bring such a charge at this late day? The charge would appear, also, to involve the memory of another person, whom death has rendered incapable of defending himself, since the notary, "a good man," Mrs. Butterfield says, whom she knew and who knew her, unless a party to the fraud, could not have certified that he examined her apart from her husband, and that she acknowledged her signature to the deed, if the person who appeared before him was her brother, a young man, 23 years of age. It would appear, too, if the theory propounded be correct, that there was still another person who was willing to risk a term in the penitentiary upon a very uncertain chance of gaining the sum of $10 by forging Mrs. Butterfield's signature to the receipt for that amount; and that in the one case, as in the other, the victim, Thomas Nunn, suspected no evil. If, however, Mrs. Butterfield found out—no matter when—that her signature to the deed had been forged, it would have been the natural thing for her, in her own interest, and would have been her plain duty to the victim of the forgery, to have informed him of the fact. Beyond that, if, during the 24 years that elapsed between the date of the deed in question and her sale to plaintiff, Thomas Nunn and those claiming under him held and enjoyed the property, with no better title than a forged deed, why did she remain silent and make no demand for an accounting? It is true she says that there was an understanding between Thomas and all the other heirs to the effect that he should use the property in consideration of his keeping it up; but on that point John Nunn seems to contradict her and to contradict himself, since, in one breath, he says:

"The only agreement that I had with Thomas Nunn was that he was to keep up the property for the use of the place. This agreement was had at the time that he paid me the $19.77 in balance of the settlement."

And, in the next breath, he says:

"Same being due me for rent of the place."

We say that the witness drew his breath between these utterances, because his statement, including a period after the word "settlement," is typewritten, and the rest, including the change of the period into a comma, is done with a pen, apparently as an afterthought.

Moreover, if Samuel and Richard were able to convert their unproductive interests into cash, and John was receiving an income from his interest, why should Mrs. Butterfield have been contented with a less profitable arrangement? But more conclusive still was the course pursued by Mrs. Butterfield after the death of her brother Thomas. The evidence shows that she bitterly resented his having left his property to Hart and Watson; that she joined her brothers, Samuel and John, in bringing a suit to annul the will by which that was done; that they claimed the estate of the testator, including the 160 acres of land inventoried as part of that estate, not as the co-owners of any portion of it, but as the heirs at law of the testator, whose disposition of it they attacked solely on the ground that it was informal (their attempt to obtain evidence that he was incompetent to make a will having, apparently, failed); and that they prayed to be put in possession of said estate, and the whole of it, as such heirs, and by no other right or title. And the evidence entirely fails to show that, during the period that elapsed between October 31, 1900 (when the suit thus referred to was dismissed, at plaintiff's cost, and Hart and Watson were put in possession of the estate, including the land, as universal legatees of Thomas Nunn), and February 16, 1910—nearly 10 years—either Mrs. Butterfield or any one else ever disputed the title of the parties so put in possession, or demanded of them an accounting, though it is not pretended that there was any understanding with those parties that they should have the use of the property of the estate, or any of it, in consideration of their "keeping it up."

The learned counsel for the present plaintiff argue that, in claiming and praying to be put in possession of the estate of Thomas Nunn as his legal heirs, Mrs. Butterfield and her coplaintiffs referred only to the movable property and to such interest as Thomas Nunn owned in the land, which they now say was three-fifths. Thus, in the latest brief filed on behalf of plaintiff, we find the following:

"The suit to break the will, if successful, would have debarred Tycus Hart and the colored person [referring to Watson] from taking under the will as universal legatees, and would have left Thomas Nunn's estate to be inherited by his legal heirs, who were the three parties figuring as plaintiffs in suit No. 3722; that is to say, they would have taken all the personal property that Nunn died possessed of and his three-fifths interest in the land—the other two-fifths being already owned, one-fifth by J. E. Nunn, and one-fifth by Mrs. Cynthia Butterfield. S. A. Nunn [one of the plaintiffs in that suit] had no interest in the land as heir of Letitia Nunn, because he had transferred his interest to his brother, R. A. Nunn, who later had sold it, along with his own one-fifth interest, to Thomas Nunn; but, if the will could have been annulled, S. A. Nunn, as one of the legal heirs of Thomas Nunn, his dead brother, would have come in for his share of the three-fifths interest in the land that Thomas Nunn owned when he died, and his share of the personal property which Thomas Nunn owned."

When, however, Samuel, John, and Mrs. Butterfield instituted the suit for the recovery of the estate of Thomas, the two last named knew that Samuel had sold his interest in the land constituting part of that estate to Richard, by whom it had been conveyed to Thomas, and yet they appear to have proceeded upon the theory that they all occupied the same relation to the subject-matter of the litigation. At all events, the petition which they filed made no distinction between them, nor did it suggest that there was any distinction to be made, upon the ground that they, or either of them, already owned part of the property, the whole of which they were claiming as the heirs of Thomas Nunn. Their allegations read, in part, as follows:

"They are the legal heirs of Thomas Nunn, who recently died, * * * leaving * * * a small estate, consisting of real and personal property; * * * that Tycus Hart, Jr., was confirmed and qualified as executor of said estate, and an inventory made according to

law, all of which will more fully appear by reference to the record of said succession. * * * which is made part hereof. * * * Wherefore petitioners pray * * * for judgment recognizing petitioners as the heirs at law of the said Thomas Nunn, * * * ordering petitioners to be put in possession of the estate of the said Thomas Nunn, according to law."

It will thus be observed that, instead of giving a detailed description of the property for which they were suing, they allege that an inventory had been made of it "according to law," and they refer, for the description, to the inventory, which they make part of their petition. It is said that the inventory does not describe the land; but it shows but one item of real estate, which calls for "160 acres"; and Mrs. Butterfield, as a witness in the case of Hamilton v. Hart, was interrogated and answered as follows:

"Q. Did Thomas Nunn own any real estate, other than that claimed by plaintiff in the present suit; if so, where was it located, and give some definite idea of the amount and extent of the land thus owned? A. No; he owned no other lands."

[1] Our conclusion as to Mrs. Butterfield then is that she signed the instrument showing that she had received $10, "part pay for the land," and that she either signed the deed, or authorized her brother to sign it, and, in either case, acknowledged the signature to be hers, and authorized the notary so to certify. "But," say the learned counsel for plaintiff, "conceding arguendo, that she did sign the deed, she was a married woman, domiciled in Texas, and, under the law of that state, as under the law of Louisiana, she was not bound by her act, because it was not concurred in by her husband"— which is quite true. But there are other factors in the case. When Mrs. Butterfield sued, as the heir at law of Thomas Nunn, to recover, as part of his estate, the property here in dispute, she *was* authorized by her husband, and we are of opinion that she and

the plaintiff, claiming under her, are estopped now to contradict the judicial admission so made, and so understood and acted on by Mrs. Butterfield herself during the (nearly) 10 years which followed. Delacroix v. Prevost's Ex'r, 6 Mart. (O. S.) 280; Gridley et al. v. Conner, 4 La. Ann. 416; Denton v. Erwin et al., 5 La. Ann. 18; Shepherd v. Phillips, 7 La. Ann. 461; Edson, Curator, v. Freret Bros., 11 La. Ann. 711; Reed et al. v. Crocker, Ex'r, 12 La. Ann. 445; Girault v. Zuntz, 15 La. Ann. 684; Gaudet v. Gauthreaux, 40 La. Ann. 189, 3 South. 645; Williams et al. v. Gilkeson-Sloss Co., 45 La. Ann. 1013, 13 South. 394; Johnson v. Marx Levy & Bro., 109 La. 1047, 34 South. 68; C. C. 1956; Wells v. Compton, 3 Rob. 183; Millikin v. Minnis, 12 La. 546.

We are not prepared to say that the judgment rendered in the suit above referred to is a sufficient basis upon which to rest a plea of res judicata, because we do not know enough about it. Where the plaintiff in a case fails to appear and prosecute, the only judgment that can be rendered is one of nonsuit, and, for aught we know, that may have been the situation in this instance. C. P. art. 536; Saunders v. Mangham, 42 La. Ann. 770, 7 South. 715.

[2] But that does not affect the question here presented, for a party is none the less bound by his judicial admissions, whether he prosecutes the suit in which they are made to a definitive judgment, discontinues without reservation, or takes a nonsuit. Byrne v. Hibernia Nat. Bank, 31 La. Ann. 83. Even, however, if Mrs. Butterfield, and the plaintiff herein, claiming under her, were not estopped by the judicial averments mentioned to bring this suit, there could be no recovery; for Mrs. Butterfield, a married woman, selling her property without the concurrence of her husband, though she may have been, nevertheless sold the property and received the money for it, and for that

reason, and also because she allowed more than 20 years to elapse after the acquisition by Thomas Nunn of the tax title, without asserting the claim which is here set up, neither she nor her subsequent vendee is in a position to invoke, as against Nunn or those holding under him, the rule that a co-owner, who acquires common property sold for taxes, does so for the benefit of his co-owners, as well as himself, for that rule is founded in equity, and those who seek equity must come with clean hands and present a case calling for the interposition of a court of equity. Duson v. Roos, 123 La. 844, 49 South. 590, 131 Am. St. Rep. 375.

We are of the same opinion with regard to the claim predicated upon the conveyance to plaintiff by John E. Nunn. It is true that no title from him to Thomas Nunn has been produced; but, as no title to him was ever recorded, and as the recorded title stood in the name of Thomas Nunn, who acquired it from a third person some four years after the tax sale, plaintiff can hardly pretend that it purchased from John Nunn on the faith of a recorded title. The explanation that John Nunn makes of the receipt given by him does not, in view of all the circumstances which have been narrated, explain to our satisfaction, and is very far from rebutting the positive testimony of Gray, to the effect that he (John), as well as Samuel and Mrs. Butterfield, told him (Gray) that he had sold his interest in the property to his brother Thomas. Plaintiff's counsel, in their brief, attack the credibility of Gray; but there was no attempt to impeach him in the lower court, and it appears to us that, being a disinterested and apparently straightforward witness, whose testimony is corroborated by almost every admitted or proved fact in the case, he is better entitled to belief than John Nunn, who does not enjoy those advantages.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be so amended as to reject the demands of the plaintiff in toto, at its cost in both courts.