## GIVENS v. WASHINGTON NAT. INS. CO.*
### No. 16554.

Court of Appeal of Louisiana. Orleans.
Nov. 30, 1936.

Cabral, Lenfant & Villere and Harry R. Cabral, all of New Orleans, for appellant.

H. W. & H. M. Robinson and J. I. McCain, all of New Orleans, for appellee.

JANVIER, Judge.

On September 16, 1929, defendant, Washington National Insurance Company, issued a policy of insurance to Percy Givens, a resident of the state of Louisiana, then thirty-three years of age. The policy stipulated that, in consideration of the specified premium, in the event of the death of Givens while the policy remained in effect, the company would pay to his designated beneficiary, Mary Ida Givens, his wife, a cash "benefit" of $135, and that, in the event of his being disabled by sickness or accident while the policy remained in effect, it would pay to him a weekly disability benefit at a rate fixed in the policy.

It stipulated for a premium of 50 cents, payable each Monday. This premium was regularly paid each week until June 26, 1933, but after that time no further premiums were paid. So that, at the time of Givens' death, which occurred on October 14, 1934, there had elapsed a period of fifteen months and eighteen days, during which no premiums had been paid.

After the death of Givens, his designated beneficiary made demand on the insurer for the proceeds of the policy, contending that, because of the provisions of Act No. 193 of 1906, the said policy had been automatically extended by the application to that purpose of the reserve which, at the time of the default, had accumulated.

Defendant company refused to make payment, maintaining that the statute in question had no application to this contract of insurance, it being a term policy for less than twenty years, and on this question the matter is now before us; the court a qua having agreed with plaintiff that the statute in question has application and that the reserve which had accumulated at the time of the default was sufficient to purchase extended insurance for a term even longer than would be necessary to include the date of Givens' death.

The act in question, which has been considered by the courts of this state on many occasions, provides that no policy of life or endowment insurance issued by any legal reserve life insurance company on the life of a resident of Louisiana, unless it be a term policy for twenty years or less, shall, after being in force three full years, lapse or become forfeited for the nonpayment of premiums until the reserve accumulated on the policy has been applied either in accordance with one of the options granted the insured, or, upon his failure to exercise one of the options, to the continuance in force of the full amount of the insurance for so long a period as the accumulated reserve will purchase at a

net single premium rate at the age which the assured has attained at the time of the discontinuance of premium payments.

As we have stated, it will be noted, by reference to that act, that policies which are written for a fixed term of twenty years or less are exempted from the provisions of the statute. Therefore, before considering several defenses based on the contention that the plaintiff has not adopted the proper method in computing the reserve, it becomes first necessary that we determine whether the policy is one for a fixed term of twenty years or less, because, if it is, then there can be no recovery, since, obviously, it had been permitted to lapse because of failure to pay premiums, and plaintiff, if she is to recover, can do so only if the policy can be said to be not a term policy for a period of twenty years or less, and, therefore, automatically extended by the operation of the statute of 1906.

Defendant, conceding that it is a legal reserve life insurance company within the meaning of the statute and that the policy was written on the life of a resident of the state of Louisiana, maintains that the policy was written for the fixed term of one week and that, though it was renewable each week, if the company should consent to each such renewal, the right on the part of the company to refuse at any time to agree to such renewal rendered each week's contract a new one and not a mere continuation of the old. Strangely enough, we do not find the policy itself in the record, but, fortunately, the parties are not in disagreement as to the actual wording of its terms and conditions, the pertinent portions of which are set forth in the various briefs.

Counsel for defendant confidently point to the stipulation which provides that "all insurance hereunder is weekly term insurance, beginning the date this contract is dated, and renewable at the option of the company," and they argue that there is nothing to prevent the parties to a contract from agreeing to any terms and conditions so long as they do not offend against good morals, or otherwise contravene public policy, and that there is nothing so offensive in the stipulation that a policy is written for a very limited time and is renewable only at the option of the insurer.

There can be no doubt of the general rule that persons may freely contract and that, no matter how onerous their contracts may be, they may enter into them so long as public policy does not interfere. But here plaintiff points to various provisions in the contract which she contends are inconsistent with the theory that it was written for the limited term of one week, and her counsel maintain that, if the policy contains irreconcilable and inconsistent provisions, the courts must interpret the contract as a whole and, in doing so, must attempt to discover the intention of the parties thereto.

In one paragraph we find reference not only to the first premium, but to the payment of further premiums "thereafter." This seems to contemplate that there will be other premiums than the one stipulated for as consideration for the first week's protection, for, if the policy is for only one week, there would be no necessity for stipulating for the payment of weekly premiums thereafter. There would be one premium and only one. Thus the company appears to agree that, so long as the premiums are paid, the protection afforded by the policy shall continue. That this was the interpretation placed on the policy by Mr. Huff, the district manager of defendant company, is made evident by the following testimony elicited from him:

"Q. You would say then, that as long as the insured pays his premiums and as long as there are no unusual circumstances, the company will continue to accept the premium and keep the insured on the books? A. Yes, sir.

"Q. Mr. Huff, assuming that there are no unusual conditions and the insured paid his premiums promptly and that he was not sick and submitted no sick claims and wanted to pay his premiums, is it not a fact that this policy would have continued for an indefinite time? * * * A. Yes, sir."

The policy also contains a provision reading as follows:

"This policy shall not lapse for non-payment of premiums until the premiums for four (4) Mondays are in arrears; * * *"

If the policy was written for the limited term of one week, it seems to us most inconsistent that it should contain a provision that it will not be considered as having lapsed until four weekly premiums are in arrears.

But, more important still, and even more indicative of the fact that in reality the

company intended to issue a policy for life subject to the continued payment of premiums and not for a limited term subject to renewal, is the fact that the premium rate stipulated for was to remain the same from week to week so long as the policy should be continued in force. It is entirely irreconcilable with the actuarial theory on which term insurance is written, that the premium for which a term policy is issued in the early life of an insured shall be the same as that at which it would have been written had the insured been in his declining years.

Mr. Copeland, an expert actuary, testified on behalf of defendant as follows on this subject:

"Q. Mr. Copeland, what I am interested in is, is it not normal actuarial soundness for the premium on a term policy to increase as the age increases? A. That is true in ordinary business, yes sir."

Obviously, when a policy is written in early life, even if nominally for a limited term, if it provides for renewals from time to time at the same premium, it is contemplated by the insurer that the policy will continue for a long, and in fact indefinite, period, and that, thus, the additional risk which attaches at old age and which would ordinarily require the assessment of a higher premium rate, will be compensated for by the fact that the fixed rate will, during the early years, produce an accumulation of reserve to provide for the additional risk during the later years. We recognized this in Johnson v. Life Insurance Company of Virginia, 169 So. 159, 164. In that case we quoted from an opinion of the Supreme Court of the United States rendered in New York Life Insurance Company v. Statham, 93 U.S. 24, 23 L.Ed. 789, as follows:

"We agree with the court below, that the contract is not an assurance for a single year, with a privilege of renewal from year to year by paying the annual premium, but that it is an entire contract of assurance for life, subject to discontinuance and forfeiture for non-payment of any of the stipulated premiums. * * * It has been contended that the payment of each premium is the consideration for insurance during the next following year,—as in fire policies. But the position is untenable. * * * Such instalments are clearly not intended as the consideration for the respective years in which they are paid; for, after they are all paid, the

policy stands good for the balance of the life insured, without any further payment. Each instalment is, in fact, part consideration of the entire insurance for life. It is the same thing, where the annual premiums are spread over the whole life. The value of assurance for one year of a man's life when he is young, strong, and healthy, is manifestly not the same as when he is old and decrepit. There is no proper relation between the annual premium and the risk of assurance for the year in which it is paid. * * * The whole premiums are balanced against the whole insurance."

 It is true that an insurer may make any rate it sees fit and may adopt a premium-fixing basis which is actuarially unsound and that, therefore, it does not necessarily follow that, in all cases in which a policy stipulates for a renewal at the same premium, the contract must be considered as merely a continuation of the old one. But the actuarial unsoundness of such a method, when viewed in connection with ambiguous clauses in the policy, may be taken into consideration in arriving at an interpretation of the policy as a whole and in determining whether the parties actually intended to make a term contract renewable at the option of the insurer, or a life contract subject to cancellation upon failure to pay premiums.

Our attention has been called to the fact that many companies write life policies for very short terms, such as one day or one week, and sell them to members of the traveling public and that the rate, regardless of the age of the insured, is always the same. We presume that when this is done the daily rate is so high that it will afford a return to the company sufficient to take care of such additional risk as may result where the person insured is in his later years, and we presume, also, that there is taken into consideration the fact that, even in the case of a very old person, the life expectancy is normally much greater than the one day or one week, or the short period for which the insurance is issued. At any rate, we do not believe that such policies and the actuarial practice followed in writing them form a guide in cases involving policies like the one before us.

In the record is the testimony of two expert actuaries, one of whom, Mr. Barthe, testified on behalf of plaintiff, and the other of whom, Mr. Copeland, interpreted

the contract as one for a term of one week only.

■ We would be much influenced by the opinions of experts in a matter dependent upon the application of the principles of sound underwriting, such as the fixing of rates, or the setting up of proper reserves; but on these matters we do not find the experts to be in material disagreement. While they do disagree sharply on the question of whether the policy in question, because of its conflicting terms and conditions, must be construed as one for life or one for a term, we conclude that the interpreting of the conflicting clauses of a contract is a task which we are fully able to perform regardless of the divergent opinions of actuarial experts. Whether one clause should be given precedence over another is not a matter in which the opinion of such experts is necessary. We view the policy as a whole and construe it as one for life, subject to cancellation.

It follows that, since it was issued by a company organized under legal reserve laws and was on the life of "a resident of this state," and since at least three annual premiums had been paid at the time of the discontinuance of the payment of premiums, it could not be "lapsed" by the defendant company until after the expiration of the period during which the accumulated reserve would have purchased extended insurance for the face amount of the policy on a single premium basis based on the age of assured at the time of the lapse.

■ But defendant contends that, even conceding that the policy is controlled by the statute of 1906, still plaintiff has not shown that the accumulated reserve was sufficient to "carry" the policy beyond the date of the death. It contends that, since the policy contained an agreement to pay disability benefits and also an agreement to pay a death benefit and since only one premium of 50 cents per week was stipulated for, there is no basis on which it can be said that any particular portion of the premium should be considered as applicable to the life insurance feature and that, therefore, it is impossible to figure the reserve since the life premium is not known. As showing that 10 cents per week is the proper amount which should be allocated and which was allocated by the company to the life feature of the con-

tract, plaintiff's counsel point to the testimony of the district manager of the company, who states that it is his understanding that the premium on such policies is prorated on the company's records, one-fifth, or 20 per cent., to the life feature of the contract, which is the basis of division for which plaintiff contends, and, also, plaintiff has offered in evidence the record in the First city court in an earlier case based on this same policy, entitled Givens v. Washington National Insurance Company and bearing No. 228333, and in which earlier record there are answers by the defendant company to interrogatories propounded, which answers show that the company itself had prorated the premium on this same policy in the proportion of 10 cents, or 20 per cent., to the life feature and 80 per cent. to the disability coverage.

Defendant maintains that the district manager is not competent to testify as to the allocation made by the company of the premium and also that the answers to the interrogatories filed in the earlier suit should not have been admitted in evidence in this suit; the contention on the second point being that, since the earlier suit was dismissed as in case of nonsuit, nothing in the record of that matter could be used as evidence in any other subsequent litigation.

Counsel for plaintiff, however, maintain that the answers to the interrogatories which were filed in the earlier suit constitute judicial admissions which may be used against the company in subsequent litigation.

There have been many decisions in which it has been held that answers to interrogatories in one suit may, in a later suit, be used against the party who made the said answers in the earlier suit. In Murison & Co. v. Butler et al., 18 La.Ann. 197, the court held that such interrogatories and answers might be introduced in a later suit since the purpose in offering the interrogatories "was to prove * * * admissions of certain facts."

In Hood v. Chambliss, 7 La.Ann. 106, the offer of answers to certain interrogatories made in an earlier suit was objected to, but the court said:

"We think the objections to the evidence were properly overruled. It is well settled, that the admissions of a party may be given in evidence against him. Even mere oral admissions in conversa-

tion may be proved; and a fortiori, what a person has declared in writing and under oath, should be admissible against him."

In Alford v. Hughes & Randolph, 14 La.Ann. 727, is found a similar ruling, and in Gulf Ref. Co. v. Hart, 130 La. 51, 57 So. 581, 586, is found a case in which the earlier litigation had resulted in a nonsuit and there the court said:

"But that does not affect the question here presented, for a party is none the less bound by his judicial admissions, whether he prosecutes the suit in which they are made to a definitive judgment, discontinues without reservation, or takes a nonsuit. Byrne v. Hibernia Nat. Bank, 31 La.Ann. [81] 83."

It is true that in that suit the nonsuit seems to have resulted from the voluntary discontinuance by the person who had made the answers to the interrogatories, but we do not see that any distinction can be based on this difference. But, even if we felt that neither the testimony given by defendant's district manager nor the answer given by defendant in the earlier suit establishes the basis of distribution of the premium, there is, we feel, a compelling reason for holding that the basis is that contended for by plaintiff. This reason is that, if that is not the correct basis, obviously the company itself was under the necessity of so showing. Sound underwriting requires that such a company allocate a portion of such a premium to each of the features of the contract and, in addition to the sound underwriting principles, we feel that it is required by the act itself to do so, though no specific mention of necessity for such division appears in the said act. Since it is required by the act that the reserve be accumulated and be applied in accordance with the act, it follows that a company may not be permitted to defeat the purpose of the statute by coupling with life protection some other form of insurance coverage, charging a single premium for the two or more risks, and then, as here, contending that there is no basis for allocating any particular portion of the premium to any particular portion of the coverage.

In view of the testimony given by the company's district manager, and especially because the company has not shown that any other basis of division was adopted by it, we accept as sound plaintiff's contention that 20 per cent., or 10 cents of each weekly premium, was, or should have been, set up on the company's books as the premium on the life feature of the contract.

■ The company next contends that even if 10 cents each week be considered as the life premium, there is not sufficient showing that such a premium would, in the time during which premiums were paid in this case, produce a reserve sufficient to carry the policy beyond the date of death.

Mr. Barthe, who testified on behalf of plaintiff, stated that, in determining the amount of reserve which had accumulated at the time of default, he based his calculation on a premium of 10 cents a week, or $5.20 a year, and that he had resorted to the actuarial, or Combined Experience Table of Mortality, and had, from that table, found that the reserve so accumulated amounted to a net sum of $2.71, after deducting the 20 per cent., or one-fifth (as required by the Act of 1906), and that, "after deducting any indebtedness to the company and one-fifth of the said entire reserve," as required by the Act of 1906, the remaining amount, applied as a net single premium, should have purchased paid-up insurance of $135 for 831 days, which would have extended the coverage far beyond the date of the death. His calculations are not shown to be erroneous and, in fact, are not criticized by defendant except in two particulars, to which we shall later refer. Defendant's actuary found no substantial fault with Mr. Barthe's calculations, but devoted himself entirely to an effort to show that the policy was nothing more than one for a term.

Counsel for defendant attacks the result reached by Mr. Barthe, contending that he had reached a different result in the earlier part of his testimony. But the calculation of Mr. Barthe shows very plainly that the different and higher result reached in the first instance was not complete and that he had not, as he very clearly shows, deducted the amount which is required to be deducted by the Act of 1906, to which we have just above referred.

Counsel for defendant maintain that Mr. Barthe should not have used the actuaries', or Combined Experience Table of Mortality, and he bases this contention, apparently, on the fact that the Act of 1906 provides that, in setting up the reserve which is required thereby, the company shall com-

**816**

pute the said reserve "according to the standard adopted by said company." But the company has not shown that it has adopted any standard other than that on which the said tables are based. It is true that there is another table of mortality which is referred to, the "American Experience Table," or "American Mortality Table"; but it is shown without contradiction that the tables used by Mr. Barthe are more favorable to the company than are the American Mortality Tables. That the tables used are approved in this state is evidenced by Act No. 114 of 1898, which fixes the method by which the Secretary of State shall value the policies of each company in Louisiana and ascertain the reinsurance reserve and surplus of every such company, and which provides that, in making such calculations, the Secretary of State shall use the "Actuaries' or Combined Experience Table of Mortality" and also the "American Experience Table of Mortality." On this score we find no fault with the calculations to which we have referred.

Counsel also attack the calculation, contending that Mr. Barthe used the age thirty-three to determine the rate at which the extended insurance should have been purchased, and that the Act of 1906 requires that the age attained at the time of default must be used and not the age of the insured at the time of the original issuance of the policy. That the act so provides is evident from a mere reading of it, but the report of Mr. Barthe, which is in the record, shows that he used the attained age in making the calculation.

We conclude that, at the time of the default, the policy had accumulated a sufficient reserve to purchase extended insurance for a period longer than would have been necessary to include the date of assured's death, and that, therefore, the policy was in full force and effect at that time.

The judgment below ran in favor of plaintiff for the face value of the policy, to wit, $135, with legal interest from judicial demand until paid and for all costs.

Though, in the original petition, the penalties and attorney's fees provided by Act No. 310 of 1910 were prayed for, we find in the record no answer to the appeal, and therefore find it unnecessary to consider the question of whether these penalties should be awarded.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be, and it is, affirmed at the cost of appellant.

Affirmed.